United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DATREN CASH,<br><br>            Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br><br>            Defendant. | Case No. 3:14-cv-04938  LB<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 17 & 18]** |

## INTRODUCTION

The plaintiff Datren Cash moves for summary judgment, seeking judicial review of a final decision by the Social Security Administration denying him disability benefits for his claimed disabilities of post-traumatic stress disorder, depression, and back and leg pain. (Motion for Summary Judgment, ECF No. 17.[1]) The Administrative Law Judge ("ALJ") found that Mr. Cash had four severe impairments but declared him not disabled and denied Social Security Income ("SSI") benefits. (Administrative Record ("AR") at 23.) The Commissioner opposes Mr. Cash's motion for summary judgment and cross-moves for summary judgment. (Cross-Motion, ECF No. 18.)

---

[1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page numbers at the tops of the documents.

1    Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

2    without oral argument. All parties have consented to this court's jurisdiction. (Consent Forms,

3    ECF Nos. 6, 10.) Upon consideration of the administrative record, the parties' briefs, and the

4    applicable legal authority the court grants in part and denies in part the plaintiff's motion for

5    summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands

6    this case to the Social Security Administration for further proceedings.

**STATEMENT**

7

8    **I. PROCEDURAL HISTORY**

9    On August 31, 2011, Mr. Cash filed a claim for SSI benefits. (AR 173-80.) He alleged that he

10   had been disabled since January 1, 1998 as a result of post-traumatic stress disorder ("PTSD"),

11   depression, and back and leg pain. (AR 176.) The Commissioner denied Mr. Cash's application

12   initially and upon reconsideration. (Initial Denial, AR 82-87; Denial upon Reconsideration, AR

13   93-97.) On August 14, 2012, Mr. Cash filed a timely request for a hearing before an ALJ. (AR 98-

14   100.)

15   On May 8, 2013, the ALJ conducted a hearing in Oakland, California. (AR 11.) Mr. Cash was

16   represented by counsel Nancy McGee at the hearing. (*Id.*) Mr. Cash appeared at the hearing by

17   telephone. (AR 31.) Vocational Expert ("VE") Gerald Belchick also testified at the hearing. (AR

18   11.) The ALJ issued an order on May 28, 2013 denying benefits. (AR 8-28.) The ALJ found that

19   Mr. Cash had severe impairments of "peripheral neuropathy; status post 1989 gunshot wound to

20   both thighs and left lower leg with fractures and open reduction, internal fixation; posttraumatic

21   stress disorder; and polysubstance abuse." (AR 13.) The ALJ then found that Mr. Cash had not

22   been under a disability since August 31, 2011. (AR 23.)

23   On July 31, 2013, Mr. Cash submitted a request for review of the hearing decision. (Request,

24   AR 7; Brief, AR 227-240.) On October 1, 2014, the Appeals Council denied Mr. Cash's request

25   for review. (AR 1-6.) Mr. Cash timely sought judicial review of the final decision denying him

26   SSI benefits. (Complaint, ECF No. 1.) On March 10, 2015, the Commissioner answered the

27   complaint. (Answer, ECF No. 14.) On April 2, 2015, Mr. Cash filed his motion for summary

28   judgment. (Motion, ECF No. 17.) The Commissioner filed an opposition and cross-motion for

United States District Court
Northern District of California

summary judgment on April 2, 2015. (Cross-Motion, ECF No. 18.) On May 8, 2015, Mr. Cash

filed a response. (Response, ECF No. 19.)

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

### A. Medical Records

#### 1. Criminal Justice Mental Health: Treatment Providers (1988)

The record indicates that Alameda County Criminal Justice Mental Health ("CJMH") staff saw

Mr. Cash on four occasions in 1988. (AR 344-47.) On April 25, 1988, CJMH staff performed an

initial evaluation of Mr. Cash. (AR 347.) The treatment notes state that Mr. Cash "looks depressed

and sleep deprived." (*Id*.) The notes also say that Mr. Cash exhibited solemn behavior when

speaking of the recent deaths of his family members, but he was not suicidal. (*Id*.) The treatment

provider diagnosed Mr. Cash with an adjustment disorder with a depressed mood. (*Id*.)

On May 2, 1988, Mr. Cash returned to CJMH. (AR. 346.) The record states an assessment of

an adjustment disorder with a depressed mood, but notes that Mr. Cash was not psychotic,

suicidal, or homicidal. (*Id*.) The treatment notes say that Mr. Cash appeared to be coping

reasonably well, although he avoided discussing the loss of his relatives. (AR 346.) The notes also

state that Mr. Cash said that the medication he was prescribed, Sinequan, had been helpful. (*Id*.)

On May 16, 1988, CJMH staff saw Mr. Cash again. (AR 345.) He continued to be assessed as

having an adjustment disorder with a depressed mood, but again the notes state that Mr. Cash was

not psychotic, suicidal, or homicidal. (*Id*.) The treatment provider found Mr. Cash to be coping

reasonably well and continued him on the Sinequan, which Mr. Cash claimed had been helpful.

(*Id*.)

Mr. Cash's last visit to the CJMH in 1988 was on May 31, 1988. (AR 344.) At that visit, the

treatment notes state that Mr. Cash's adjustment disorder with depressed mood had resolved. (*Id*.)

The treatment notes also state that Mr. Cash appeared to have resolved whatever grief had existed

and that he no longer appeared to be have difficulty sleeping or coping with his situation. (*Id*.) Mr.

Cash was not given any further appointments, and the treatment with Sinequan was discontinued.

(*Id*.)

United States District Court
Northern District of California

### *2. Twin Cities Community Hospital: Treatment Providers (February 3-8, 2005)*

In February 2005, Mr. Cash received medical care from Twin Cities Community Hospital for chronic osteomyelitis in his ankle/foot and an ulcer in his toe. (AR 258-332.) During this hospital stay, Mr. Cash had one of his toes amputated. (AR 259.) The medical reports note a serious gunshot wound on the left leg from 1989 with an open reduction, internal fixation, and chronic infection. (AR 259.)

### *3. Santa Rita Jail: Treatment Providers (June 2, 2011-May 6, 2012)*

While Mr. Cash was incarcerated at Santa Rita Jail during the period June 2, 2011 to May 6, 2012, he was provided with a number of prescription medications including Clonidine for hypertension, Neurontin for nerve pain, Vicodin for analgesia, and aspirin for anticoagulation therapy. (AR 451-465.) The record notes that the Vicodin was prescribed for the chronic leg discomfort Mr. Cash experienced from his old gunshot wound. (AR 469.) Mr. Cash was undergoing opiate withdrawal as indicated on the Clinical Opiate Withdrawal Scale (COWS) charts in the record. (AR 371, AR 471-500.) Mr. Cash was prescribed Remeron, as discussed below. (AR 357, AR 461.)

### *4. CJMH: Treatment Providers (2011-2012)*

The next mental health treatment notes in the record for Mr. Cash at the CJMH are from July 2011. (AR 342.) On July 12, 2011, CJMH staff Kameswari Jammalamadaka, a licensed marriage and family therapist ("LMFT"), performed an assessment and a mental-status exam on Mr. Cash. (AR 342-43.) The exam notes say that Mr. Cash's mood was depressed and anxious and that he had a constricted affect. (AR 343.) The exam notes also state that Mr. Cash's insight was good and that he had no hallucinations. (*Id.*) The clinical assessment portion of the notes states that Mr. Cash reported nightmares and flashbacks and that he was unable to sleep. (*Id.*) Mr. Cash reported that he had used heroin and cocaine, but at the time of the assessment, he reported that he had been sober for almost 18 months. (AR 342.) The notes state that Mr. Cash had received "psych meds in prison since his toe was amputated, [and that he] had bad dreams since then (10 yrs. ago)." (*Id.*) The notes indicate a diagnosis of PTSD and that Mr. Cash was referred to SSI. The notes state a "psych-med" evaluation as a "goal and objective." (AR 343.)

On July 12, 2011, Mr. Cash also saw a CJMH psychiatrist, Dr. Graves-Matthews. (AR 340.) The progress notes for that visit state that Mr. Cash was a "poor historian who was not clear where or when he had received psychiatric care." (*Id.*) Mr. Cash also appeared to be inconsistent in his statements about medications, saying that his last medication was Seroquel in prison in 2004, but also mentioning "HGH" seven months before. (*Id.*) Mr. Cash reported to Dr. Graves-Matthews that he was having insomnia and nightmares. (*Id.*) Mr. Cash also noted depression, primarily related to worry about his girlfriend, who was very ill. (*Id.*) The progress notes also state that Mr. Cash has PTSD. The doctor prescribed Remeron for Mr. Cash. (AR 340-41.)

On July 12, 2011, Dr. Graves-Matthews and LMFT Jammalamadaka filled out a Medical Source Statement form. (AR 334.) This form indicates that at the time the form was completed, the doctor and the LMFT had seen Mr. Cash only once. (*Id.*) The form states a diagnosis of PTSD and notes that Mr. Cash was a victim of child abuse. (*Id.*) The form indicates that Mr. Cash has a Global Assessment of Functioning ("GAF") score of 48. (*Id.*) The Medical Source Statement states a clinical finding that Mr. Cash has "anxiety, nightmares, difficulty concentrating and depressed mood" and that these conditions are expected to last at least twelve months. (*Id.*) The form also states that Mr. Cash experienced "marked" limitations in restrictions of the activities of daily living, difficulties in maintaining social functioning, and deficiencies in concentration, persistence, and pace. (*Id.*)

On August 9, 2011, Mr. Cash refused an appointment with LMFT Jammalamadaka (AR 339.) The treatment notes also indicate that on August 2, 2011, Mr. Cash refused an appointment with his SSI lawyer. (*Id.*)

On August 16, 2011, LMFT Jammalamadaka briefly visited Mr. Cash in his housing unit to ask about the refused appointments. (*Id.*) The notes state that Mr. Cash "shared that he did not refuse but put in a request to see" LMFT Jammalamadaka and that Mr. Cash also requested another appointment with his SSI counsel. (*Id.*)

Progress notes dated August 22, 2011 report that Mr. Cash refused an "M.D." appointment and that Mr. Cash was "apparently only interested in receiving SSI benefits, as he refused to wait to see [the] clinician" after meeting with the social security representative on August 17, 2011. (AR

United States District Court
Northern District of California

1   338.) At that time, Mr. Cash was on "minimal medication." He had been prescribed 15mg. of

2   Remeron for depression and insomnia. (*Id*.)

3        Mr. Cash met with LMFT Jammalamadaka again on October 17, 2011. (AR 422.)  Mr. Cash

4   reported that he had missed his appointment the prior week because housing unit deputies left

5   without him. (*Id*.) He also missed his SSI appointment with his lawyer. (*Id*.)

6        The next progress notes in Mr. Cash's record are from a physician covering for Dr. Graves-

7   Matthews.[2] (AR 421.) These notes state the following: Mr. Cash is due for release soon and that

8   he is "fine"; he is compliant with his medications and reports no side effects; he has no self-

9   injurious thoughts or plans, he denies hallucinations, and he is concerned about getting

10  methadone. (*Id*.) The treatment notes indicate depression and that Remeron will be ordered for Mr.

11  Cash for his release. (*Id*.)

12       Mr. Cash saw LMFT Jammalamadaka on October 28, 2011. (AR 420.) Mr. Cash reported that

13  he was to be released on October 30, 2011. The treatment notes state that Mr. Cash participated

14  very minimally in counseling and seemed to share very little insight. LMFT Jammalamadaka

15  reported that Mr. Cash seemed stable and calm. (AR 420.)

16       ***5. Dr. Khalsa: Consulting Psychologist (October 10, 2011)***

17       Mr. Cash's SSI counsel referred Mr. Cash to Dr. Puran Khalsa, Psy.D. for a psychological

18  evaluation. (AR 408.) The evaluation took place on October 10, 2011. (*Id*.) The stated purpose of

19  the examination was to determine Mr. Cash's level of cognitive and emotional functioning. (AR

20  409.)

21       Dr. Khalsa noted that Mr. Cash's psychiatric history included exposure to violence and

22  physical and mental abuse early in his childhood. Mr. Cash was shot on two separate occasions:

23  one time in both legs and one time in the head. (AR 410.) As to his history of substance abuse, Mr.

24  Cash reported full sobriety without periods of relapse since 2000 and denied any current drug use.

25  (*Id*.)

26       Dr. Khalsa noted that during the mental status exam, Mr. Cash was expressionless and had a

27

28
_____

[2] The physician's signature and the date are illegible.

United States District Court
Northern District of California

restricted affect, which matched his depressed presentation. (AR 410.) Dr. Khalsa stated that Mr. Cash's thoughts gravitated towards suicidal thoughts and homicidal ideations, and that Mr. Cash relayed ideas of hopelessness and worthlessness. (*Id.*) The report indicates that Mr. Cash evidenced poor insight and judgment and was completely unmotivated for treatment. (*Id.*) Mr. Cash also showed severe orientation problems related to time and place. (*Id.*)

Dr. Khalsa administered the following procedures: a clinical interview; a Test of Memory Malingering ("TOMM"); a Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS")–Form A; Trail Making A & B; Clock Drawing Task; Mini Mental State Examination ("MMSE"); Barona Estimate ("IQ"); Beck Depression Inventory ("BDI-II"); Beck Anxiety Inventory ("BAI"); and a Mental Status/Psychiatric Symptoms Sheet. (AR 410-11.)

Dr. Khalsa noted that Mr. Cash was cooperative with the evaluation and appeared to put forth adequate effort in the testing. (AR 411.) The test results indicated that Mr. Cash had an IQ in the low average range and that there was indication of a potential cognitive disorder. (*Id.*) The RBANS test indicated a marked memory impairment. (*Id.*) Mr. Cash's memory did not improve significantly when using repetition or when prompted by clues. (AR 412.)

Mr. Cash also demonstrated severe impairments in attention/concentration and visual/spatial abilities and marked limitations in language and in executive functioning. (AR 412-13.) In terms of Mr. Cash's emotional functioning, Dr. Khalsa found that the testing and the clinical interview indicated that Mr. Cash was experiencing an "ongoing mood disturbance with Major Depressive symptoms and severe anxiety." (AR 413.)

The diagnostic impression section of the report indicates that Mr. Cash has the following: a "History of Traumatic Brain Injury"; "Bipolar I disorder, Single Manic Episode, most recent episode depressed with psychotic features"; "Delusional Disorder"; "Posttraumatic Stress Disorder, Chronic"; "Generalized Anxiety Disorder"; and a "Cognitive Disorder NOS." (*Id.*)

Dr. Khalsa's report concluded that Mr. Cash

> continues to exhibit a number of features that are characteristic of a delusional disorder showing ideas of reference, feelings of grandiosity, irrational jealousy. Characteristically self-centered and uncharitable, he is likely to become increasingly isolated and withdrawn as well as quarrelsome and quick-tempered. Because these symptoms have been going for such a long duration it is not clear if

United States District Court
Northern District of California

they are the result of a prolonged mood disturbance, PTSD, or traumatic brain injury.

(AR 414.)

Dr. Khalsa opined that Mr. Cash should begin cognitive therapy as soon as possible and notes that if Mr. Cash's symptoms were left untreated they would "increase in intensity and likely culminate in further cognitive distortion, negatively impacting his ability for reality testing." (*Id*.) Dr. Khalsa stated that even with treatment, Mr. Cash will likely have active post-traumatic symptoms for the rest of his life. (*Id*.)

In regard to Mr. Cash's mental abilities and aptitudes needed to do unskilled work, Dr. Khalsa noted "marked" restrictions on Mr. Cash's ability to understand, remember, and carry out both detailed and very short and simple instructions. (AR 415.) Dr. Khalsa noted "extreme" restrictions on Mr. Cash's ability to do the following: maintain attention and concentration for two hours; perform at a consistent pace without an unreasonable number and length of rest periods; get along and work with others; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting and deal with normal work stressors; complete a normal workday and workweek without interruptions from psychologically based symptoms; and maintain regular attendance and be punctual within customary, usually strict tolerances. (*Id*.)

### 6. Dr. Haroun: State Agency Non-Examining Physician (November 7, 2011)

On November 7, 2011, Dr. Haroun, acting as a medical consultant for the Social Security Administration, filed a Physical/Mental Residual Functional Capacity Assessment. (AR 54-63.) Dr. Haroun reviewed Mr. Cash's mental health records for the period July through November 2011, and Dr. Khalsa's report. (AR 54-55, 57.) In his analysis, Dr. Haroun noted that Mr. Cash had received "minimal psychiatric treatment." (AR 58.) Dr. Haroun indicated that most of the medical evidence in the record "shows no mental problems just a history of extensive substance use. . . ." (AR 58.)

Dr. Haroun stated that there are notes in Mr. Cash's file that suggest PTSD and depression, but he found no evidence in the jail medical records of cognitive impairment. (*Id*.) Dr. Haroun stated that the records indicate that Mr. Cash missed a psychiatry appointment and that the records also

note that Mr. Cash is only interested in getting SSI benefits. (*Id.*) Dr. Haroun also mentioned jail medical records that note the following: Mr. Cash was stable and calm; on October 2011, Mr. Cash reported feeling good; Mr. Cash was compliant with his prescription for Remeron; and his "only concern was [the] ability to get [a] Methadone prescription." (*Id.*)

Dr. Haroun said that while Dr. Khalsa suggested severe limitations, that assessment is inconsistent with the rest of the medical records. (*Id.*) Dr. Haroun stated that he is giving more weight to the "longitudinal evidence from treating sources" than to Dr. Khalsa's report. (*Id.*) Dr. Haroun also said that he is giving Dr. Khalsa's report less weight because there is "no supporting evidence." (AR 61.) Dr. Haroun found Dr. Khalsa's report to be "an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." (AR 64.)

Dr. Haroun found that Mr. Cash had medically determinable impairments of an affective disorder (12.04), an anxiety related disorder (12.06), and substance addiction disorder (12.09). (AR 59-60.) Dr. Haroun found that the results of these disorders would be (1) a mild restriction on the activities of daily living and (2) moderate restrictions on social functioning and maintaining concentration, persistence, or pace. (AR 60.) Dr. Haroun found Mr. Cash's statements in the record regarding his symptoms to be "partially credible" but did not find his statements about the intensity, persistence, and functionally limiting effects of his symptoms to be substantiated by the objective medical evidence alone. (AR 61.)

In terms of Mr. Cash's mental residual functional capacity, Dr. Haroun found that (1) Mr. Cash was not significantly limited in his ability to remember locations and work-like procedures and to understand and remember very short and simple instructions, and (2) he was moderately limited in his ability to understand and remember detailed instructions. (AR 62.)

In terms of concentration and persistence limitations, Dr. Haroun found that Mr. Cash was not significantly limited in his ability to do the following: carry out very short and simple instructions; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from

psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*.)

Dr. Haroun found that Mr. Cash was moderately limited in his ability to do the following: carry out detailed instructions; maintain attention and concentration for extended periods; and work in coordination with or in proximity to others without being distracted by them. (*Id*.)

In terms of social interaction, Dr. Haroun found that Mr. Cash was not significantly limited in his ability to do the following: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (AR 62-63.)

Dr. Haroun found that Mr. Cash would be moderately limited in his ability to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 62-63.)

In terms of adaptation limitations, Dr. Haroun found that Mr. Cash would not be significantly limited in his ability to be aware of normal hazards and to take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (AR 63.) Dr. Haroun found that Mr. Cash would be moderately limited in his ability to respond appropriately to changes in the work setting. (*Id*.)

In sum, Dr. Haroun concluded that Mr. Cash does have a disability but that "the evidence suggests that [Mr. Cash] should be able to perform at least simple unskilled tasks in a non-public setting." (AR 58.)

### 7. Highland Hospital: Treatment Provider (January 15, 2012 – August 2, 2012)

In July and August 2012, Mr. Cash was admitted to Highland Hospital with complaints of left ankle pain and left toe pain after sustaining two falls at home. (AR 692-97.) The findings state that Mr. Cash has remote healed distal femoral deformity and a bullet fragment in his bony structures and soft tissues of the lower thigh and femur. (AR 697.) The findings also state that Mr. Cash is alert and has no acute distress. (AR 692.)

### 8. Dr. Shefayee: Treatment Provider (May 14, 2012)

On May 14, 2012, Dr. Said Shefayee, a CJMH psychiatrist, completed a mental impairment

United States District Court
Northern District of California

1   questionnaire ("MIQ") regarding Mr. Cash. (AR 597.) Dr. Shefayee saw Mr. Cash 20-60 minutes

2   monthly. (*Id*.)

3       Dr. Shefayee stated that Mr. Cash is taking Remeron and that the side effect for that

4   medication for Mr. Cash is that he "spaces out." (*Id*.) The MIQ indicates that Mr. Cash has a low

5   IQ or reduced intellectual functioning, but that he is able to manage funds in his own best interest.

6   (*Id*.)

7       Dr. Shefayee's clinical findings include PTSD, nightmares, inability to sleep, and depression.

8   (*Id*.) Dr. Shefayee identified Mr. Cash as having the following signs and symptoms: anhedonia;

9   decreased energy; flat affect; impairment in impulse control; generalized persistent anxiety;

10   somatization unexplained by organic disturbance; mood disturbance; difficulty thinking and

11   concentrating; recurrent and intrusive recollections of the traumatic experience; psychomotor

12   agitation; passivity; persistent disturbances of mood or affect; vision disturbance; paranoid

13   thinking; seclusiveness; emotional withdrawal or isolation; persistent irrational fear of a specific

14   object, activity, or situation which results in a compelling desire to avoid the dreaded object,

15   activity, or situation; thinking disturbances (sometimes); motor tension; emotional lability; deeply

16   ingrained, maladaptive patterns of behavior; unrealistic interpretation of physical signs or

17   sensations associated with the preoccupation or belief that one has a serious disease or injury;

18   sleep disturbance; recurrent severe panic attacks manifested by a sudden unpredictable onset of

19   intense apprehension, fear, terror, and sense of impending doom occurring on the average of at

20   least once a week; a history of multiple physical symptoms of several-years duration beginning

21   before 30 that have caused the individual to take medication frequently, see a physician often, and

22   alter life patterns significantly; and involvement in activities that have a high probability of painful

23   consequences, which are not recognized. (AR 598.)

24       The MIQ also notes the following impairments on mental ability and aptitude to do unskilled

25   work:

26       "Mild" restrictions on the ability to accept instructions and respond appropriately to criticism

27   from supervisors and to get along with co-workers or peers without unduly distracting them. (AR

28   599.)

United States District Court
Northern District of California

"Moderate" restrictions on the ability to carry out very short and simple instructions. (*Id*.)

"Marked" restrictions on the ability to do the following: remember work-like procedures; understand and remember simple and short instructions; maintain attention for two-hour segments; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; respond appropriately to changes in a routine work setting;  and be aware of normal hazards and take appropriate precautions. (*Id*.)

"Extreme" restrictions on the ability to do the following: maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or in proximity to others without being unduly distracted; and deal with normal stress. (*Id*.)

The MIQ notes the following restrictions on Mr. Cash's impairment of mental abilities and aptitudes needed to do semiskilled and skilled work:

"Marked" restrictions on the ability to understand and remember detailed instructions, carry out detailed information, set realistic goals, or make plans independently of others. (AR 600.);

"Extreme" restrictions on the ability to deal with semiskilled and skilled work. (*Id*.)

The MIQ notes the following restrictions on Mr. Cash's impairment of mental abilities and aptitude needed to do particular types of jobs:

No restrictions on the ability to adhere to basic standards of cleanliness;

"Mild" restrictions on the ability to maintain socially appropriate behavior; and

"Marked" restrictions on the ability to interact with the general public, travel to unfamiliar places, and use public transportation. (*Id*.)

The MIQ notes that Mr. Cash has (1) "marked" functional limitation in maintaining social functioning and in concentration, persistence, and pace and (2) an "extreme" limitation in the activities of daily living. (*Id*.)

The MIQ notes that Mr. Cash reported that he had experienced periodic episodes of decompensation, but that he was unable to recall the dates. (AR 600-01.) Dr. Shefayee stated that Mr. Cash's impairments would remain as severe in the absence of substance abuse because Mr.

United States District Court
Northern District of California

Cash had been incarcerated without access to substances and continued to be symptomatic. (AR 601.)

### 9. Dr. Lewis: State Agency Medical Evaluator (July 28, 2012)

On July 28, 2012, Dr. Rose Lewis of MDSI Physician Services completed a "comprehensive internal medicine evaluation" of Mr. Cash. (AR 677.) The evaluation said that Mr. Cash would have the following restrictions: (1) maximum standing/walking capacity: up to two hours because of the decreased balance, diabetic neuropathy, and the fixed left ankle; (2) maximum sitting capacity: up to six hours; (3) maximum lifting/carrying capacity: 20 pounds occasionally and 10 pounds frequently because of the diabetic neuropathy, the decreased ankle range of motion with fixed ankle, and decreased balance; (4) postural activities: occasionally for all because of the neuropathy, decreased range of motion of the left ankle, and decreased balance; (5) manipulative activities: frequently on all; and (6) workplace environmental activities: limitation on heights and heavy machinery, again because of the decreased balance, the diabetic neuropathy, and the fixed left ankle with decreased range of motion. (AR 680.)

In the activities-of-daily living section of the evaluation, it states that Mr. Cash can take care of his own personal needs and that Mr. Cash reported that he "can do vacuuming and dishes without difficulty" but he could not mop the floor due to his fear of slipping. (AR 677.) The evaluation also notes that Mr. Cash watches television and talks with his friends. (*Id.*)

### 10. Drs. Chiang and Salib: State Agency Non-Examining Physicians (August 10, 2012)

On August 8, 2012, the Social Security Administration requested that Dr. L. C. Chiang and Dr. Salib reconsider Mr. Cash's disability determination. (AR 67.) From the record, Drs. Chiang and Salib were provided with medical records from the MDSI Physician Group, Mr. Cash's jail medical records, Dr Khalsa's report, some "misc" medical records that had been made part of Mr. Cash's SSI file in July 2012, and records from the Homeless Action Center.[3] (AR 68-71.) Dr. Chiang noted that he gave less weight to Dr. Khalsa's assessment, finding that there was "no supporting evidence." (AR 74.)

---

[3] The record does not state what these records were.  (AR 68.)

1    Dr. Chiang and Dr. Salib completed a physical and mental residual functional capacity

2  assessment. (AR 74-76.) Dr. Chiang found that Mr. Cash's physical residual functional capacity

3  had the following exertional limitations: occasionally lift or carry only up to 20 pounds; frequently

4  lift or carry only up to 10 pounds; stand and/or walk for a total of two hours; sit for a total of about

5  six hours of an eight-hour workday; push and pull limitations in lower extremities; and postural

6  limitations. (AR 75.) Dr. Chiang further noted that Mr. Cash could only occasionally climb stairs,

7  ladders, and scaffolds, balance, stoop, kneel, crouch, and crawl. (AR 75.) Dr. Chiang noted no

8  limits on Mr. Cash's ability to withstand extreme cold or heat, wetness, humidity, noise, vibration,

9  and fumes. (AR 75.) Dr. Chiang noted that Mr. Cash should avoid concentrated exposure with

10  heights and hazardous machinery. (AR 75.)

11    In terms of Mr. Cash's mental residual functional capacity, Dr. Salib found overall that Mr.

12  Cash had mild restrictions on the activities of daily living and moderate difficulties in maintaining

13  social functioning, concentration, persistence, and pace. (AR 73.)

14    The analysis notes that Mr. Cash had comprehension and memory limitations. (AR 77.) Dr.

15  Salib noted no significant limitations on Mr. Cash's ability to do the following: remember

16  locations and work-like procedures; understand and remember short and simple instructions; carry

17  out short and simple instructions; maintain regular attendance; sustain an ordinary routine; make

18  simple work-related decisions; work a normal workweek without interruption from

19  psychologically based symptoms and perform at a consistent pace without an unreasonable

20  number and length of rest periods; ask simple questions or request assistance; accept instructions

21  and respond appropriately to criticism; have awareness of normal hazards and ability to take

22  precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make

23  plans independently of others. (AR 76-77.)

24    Dr. Salib also noted moderate limitation on Mr. Cash's ability to carry out detailed

25  instructions, maintain concentration for an extended period of time, work with others without

26  being distracted, interact appropriately with the public, get along with co-workers without

27  distracting them, and respond appropriately to changes in the work setting. (AR 76-77.)

28

United States District Court
Northern District of California

***11. CJMH: Treatment Provider (December 11, 2012 – February 5, 2013)***

Mr. Cash was arrested on November 23, 2012 (AR 703.) On December 11, 2012, Mr. Cash refused his appointment with CJMH. (AR 702.)

On January 10, 2013, LMFT Jammalamadaka filled out a brief assessment form regarding Mr. Cash. (AR 703.) LMFT Jammalamadaka observed that Mr. Cash, though fairly groomed, seemed very irritable and constantly complained about not receiving adequate medical care. (*Id.*) The assessment notes that Mr. Cash's "last psych meds were taken a week before his arrest." (*Id.*) Mr. Cash reported that he had been taking Remeron and Benadryl. Mr. Cash reported no suicidal or homicidal ideations. (*Id.*) The assessment notes a history of PTSD. (*Id.*) The assessment also notes that Mr. Cash was "mainly focused on SSI benefits," that Mr. Cash's SSI hearing had been scheduled, and that he seemed very content. (*Id.*)

On January 16, 2013, Dr. Sachdev Neelam, a contract psychiatrist with CJMH, met with Mr. Cash for an evaluation. (AR 704.) Mr. Cash stated "I am depressed, need my medicines." (*Id.*) Mr. Cash said that he had been taking Remeron and Benadryl and that when he is on Remeron he is "alright." (*Id.*) Mr. Cash reported trouble sleeping, bad dreams, and hearing voices. (*Id.*) Mr. Cash said that when he stays by himself, he calms down. (*Id.*) Mr. Cash also reported that he had used heroin in the past but had stopped five years before. (*Id.*)

Dr. Neelam made the following objective findings regarding Mr. Cash: "Alert, oriented x3, obese, cooperative, good eye contact, speech clear, coherent, mood is described as little depressed as 'I am worried about stuff,' affect is restricted and somewhat anxious." (*Id.*) Dr. Neelam also noted that Mr. Cash was easily distracted, but that his thought process was linear and organized and that there was no evidence of a thought disorder. (*Id.*) Dr. Neelam found poor insight and impaired judgment. (*Id.*)

Finally, Dr. Neelam assessed Mr. Cash with an opioid-induced mood disorder and opioid dependence and noted that Mr. Cash reported taking methadone prior to coming to Santa Rita Jail. (*Id.*) Dr. Neelam met with Mr. Cash again on January 30, 2013. (AR 706.) The treatment notes state that Mr. Cash was on Remeron and Benadryl and report that he was doing better on the medicines and was sleeping better. (*Id.*) Mr. Cash said that he was still hearing voices and having

1    bad dreams. (*Id*.) Dr. Neelam noted that Mr. Cash's speech was clear and coherent but that his

2    mood was depressed, his affect was restricted, and he was somewhat irritable and demanding. (*Id*.)

3                    ***12. Susan Dawkins: Evaluator (March 13, 2013 – April 16, 2013)***

4          Susan Dawkins is a licensed clinical social worker ("LCSW") with Alameda County

5    Healthcare for the Homeless. (AR 736.) Ms. Dawkins met with Mr. Cash on March 13, March 20,

6    and April 8, 2013. (AR 736-741.) When Ms. Dawkins met with Mr. Cash on March 13, 2013, she

7    noted that Mr. Cash reported feeling depressed since the age of seven. (AR 736.) He also reported

8    no tolerance for being around people or loud noises. (*Id*.)  The treatment notes say that Mr. Cash is

9    being treated by Dr. Turner at West Oakland Health for physical issues and depression and that

10   Mr. Cash is taking methadone, Benadryl, and Remeron. (*Id*.) Ms. Dawkins diagnosed Mr. Cash

11   with prolonged post-traumatic stress disorder and major depressive disorder.

12         On March 20, 2013, Ms. Dawkins notes that Mr. Cash's complaints are consistent with PTSD.

13   (AR 738.) She further notes that Mr. Cash "[s]eems to have become more aware of these problems

14   since he stopped hard drugs almost one year ago." (*Id*.) Ms. Dawkins states that Mr. Cash fell

15   asleep twice during the visit. (*Id*.) Her diagnosis on March 20th was as follows: prolonged post-

16   traumatic stress disorder; major depressive disorder, recurrent, severe, without psychotic features;

17   and cognitive disorder NOS. (*Id*.)

18         On April 8, 2013, Ms. Dawkins saw Mr. Cash again. (AR 740.) She states that he had missed

19   the last session due to "mixing up the days." (*Id*.) Mr. Cash reported some suicidal ideations but

20   "his grand babies give him reason to live." (*Id*.) The report describes Mr. Cash as "[d]epressed,

21   anxious, easily angered, lonely, empty, bored." (*Id*.)

22         On April 16, 2013, Ms. Dawkins provided a psychosocial evaluation. (AR 742.) The

23   evaluation notes that Mr. Cash shows marked impairments in memory and severe impairments in

24   attention and concentration. (AR 744.) The evaluation noted marked impairments in language and

25   executive functions and severe impairments in visual and spatial abilities. (*Id*.) Ms. Dawkins

26   stated that the most accurate diagnosis is dementia secondary to brain injury, the symptoms of

27   which include persistent memory impairments, attentional problems, irritability, anxiety,

28   depression, and changes in personality. (*Id*.) Despite the overlap in symptoms, Ms. Dawkins also

United States District Court
Northern District of California

concluded that Mr. Cash met the criteria for post-traumatic stress disorder and major depression. In her conclusion, Ms. Dawkins also addressed other doctors' and clinicians' misdiagnoses of Mr. Cash, attributing all misdiagnoses to the underlying factor of Mr. Cash's significant cognitive and emotional distress. (AR 744.) Ms. Dawkins also noted that no personality disorder could be assigned due to the profound effects of the head trauma. (AR 744.) Ms. Dawkins reported Mr. Cash's diagnoses as follows: dementia due to head trauma without behavioral disturbance; major depression, recurrent, severe with psychotic features; post-traumatic stress disorder, chronic, with delayed onset; and polysubstance dependence in sustained full remission. (AR 745.) Ms. Dawkins also noted that Mr. Cash is a severely impaired individual who is incapable of meeting the demands of even the simplest occupation. (*Id.*)

In an addendum dated May 3, 2013, Ms. Dawkins noted that Mr. Cash tested positive for cocaine and heroin use four to five months after stating that he was sober. (AR 748.) The addendum also states that Mr. Cash was prescribed methadone to curb the severe withdrawal symptoms of heroin addiction and that if he ran out of the medication, he likely would resort to purchasing heroin on the street to hold him over until he could get back on his prescribed medication. (AR 748.) Ms. Dawkins further clarified that whether or not Mr. Cash is using drugs, he is disabled, and that his severe cognitive impairments and PTSD are not caused by drug use or drug withdrawals. (*Id.*) Ms. Dawkins opines that Mr. Cash's "disabilities would exist even without any drugs in his system." (*Id.*)

**B. Mr. Cash's Testimony**

Mr. Cash testified before the ALJ by telephone on May 8, 2013. (AR 31.) Mr. Cash stated that he had a GED. (AR 32.) Mr. Cash testified that he could read the front page of a newspaper but sometimes he did not understand it. (AR 33.) He could read a simple phone message and understand it. (*Id.*) Mr. Cash testified that when he goes into a store he can sometimes do the arithmetic to figure out how much money he is supposed to get back, and sometimes he needs to rely on the clerk. (AR 33.)

When asked about his living accommodations, Mr. Cash stated that he lived with his daughter and her three children in his daughter's apartment. (AR 34.) Mr. Cash said that he was very fond

United States District Court
Northern District of California

1  of his three grandchildren. (*Id*.) Mr. Cash stated that he did not drive, and to get around, people

2  take him places or he uses BART (public transportation), if it is not crowded. (AR 34.)

3  When asked about his employment history, Mr. Cash testified he was not working at the time

4  of the hearing, that he had not worked at all in the year and half or two years before the hearing,

5  and that he had not had a full-time job at all in the past fifteen years. (AR 34.) Mr. Cash stated that

6  he had recently gotten out of Santa Rita Jail and that he had been released from prison in 2012.

7  (AR 35.) When the ALJ asked him if he had worked in prison, Mr. Cash stated that there weren't

8  enough jobs and that his skill level was not high enough for him to work outside the prison

9  grounds. (AR 35.)

10  Mr. Cash also stated that he could not work because his legs hurt if he stands for too long and

11  that he cannot bend much because of the rods in both of his legs. (AR 35.) Mr. Cash elaborated

12  that he could stand for about 30 to 40 minutes and could walk at least two blocks before he would

13  need to stop and rest. (AR 36.)

14  When asked about his ability to lift, Mr. Cash stated that he has trouble lifting due to a loss of

15  muscle in his right arm from a motorcycle accident but that he could lift about 30-40 pounds. (AR

16  36.) Mr. Cash said that he does not have problems sitting and that he could sit in a chair if it were

17  comfortable and not stiff. (*Id*.)

18  Mr. Cash also testified that one of the problems that keeps him from working is that he forgets

19  things and that he doesn't like "bothering people" to ask them the same question. (AR 35.)

20  Mr. Cash testified about his prescription drug regimen. (AR 37.) The ALJ asked Mr. Cash if

21  he used "street drugs." (*Id*.) Mr. Cash responded that he tried to "shy away" from them but that he

22  was "tending to run back to using drugs when [he] got real depressed." (AR 37.) He said that he

23  had sniffed heroin a couple times a year over the last three years and that he had used heroin most

24  recently a couple of months before the hearing. (AR 37-38.) Mr. Cash said that he had also used

25  crack cocaine about two times in the last year. (AR 38.) Mr. Cash said that he had not used

26  intravenous drugs in a long time. (*Id*.) Mr. Cash said that he did not like to use drugs around his

27  grandchildren. (AR 38-39.)

28  When asked about his daily life, Mr. Cash testified that on a typical day, he wakes up around

7:00 a.m. (AR 39.) He spends much of his time at home watching TV. (*Id*.) When asked about chores, Mr. Cash stated that he sweeps and that his daughter does the laundry, shopping, and cooking. (AR 39-40.) When asked about his sleeping patterns, Mr. Cash stated that sometimes if he is upset or depressed, he will "stay in the room all day and sleep." (AR 40.) When questioned further by his attorney on this topic, Mr. Cash stated that this happened to him about six times a month. (AR 44.) He testified that when he is in his room, his daughter and grandchildren try to get him to come out, but he avoids them. (*Id*.) Mr. Cash also testified that his daughter sometimes complains that he is irritable and hard to get along with. (AR 45.)

Mr. Cash testified that sometimes he goes to sleep at 11:00 p.m., but other times he does not want to go to sleep because he does not want to have a nightmare. (AR 40.) In response to questioning from his lawyer, Mr. Cash said that sometimes he stays up at night because of his depression and that he watches television, and sometimes if he gets up to go to the kitchen or the bathroom, he will forget that he was watching the TV in the living room. (AR 44-45.)

Mr. Cash testified that he has a couple of friends that he sees sometimes and that he enjoys being around one or two of them. (*Id*.) When asked about his family situation, Mr. Cash stated that all his siblings were deceased but his mother was still alive. (AR 41.) Mr. Cash testified that he loved and got along well with his mother and daughter and that he enjoyed being around his grandchildren. (AR 41.)

When the ALJ asked him, "[d]o you feel like you're worth much, or not much at all," Mr. Cash responded, "a little something." (AR 41.) The ALJ then asked Mr. Cash if he felt that things would get better. Mr. Cash responded that he thought "things will get better if I keep getting help from the people that I'm getting help from." (*Id*.)

When asked about his hallucinations, Mr. Cash testified that sometimes he "hears things," such as people calling his name or screaming when no one is around. (AR 41-42.) Mr. Cash stated that he may be paranoid due his upbringing in the projects of West Oakland, but he also said that he was not more frightened than he really needed to be. (AR 42.) Mr. Cash also testified that he thinks a lot about having been shot and having seen people killed. (AR 42-43.)

When asked whether he looked for work after his release from prison, Mr. Cash stated that he

1  had not been able to because he was "just isolated, staying in the house a lot." (AR 43.)

2  Mr. Cash's counsel asked him if he had applied for general assistance benefits on his own or

3  whether he had help with the process. (AR 45.) Mr. Cash stated that he received help from his

4  attorney and "people at that office." (AR 45.) Mr. Cash also mentioned that he missed

5  appointments during the General Assistance application process because he had gotten the days

6  "mixed up." (*Id.*) He testified that he had missed doctor's appointments because he had mixed up

7  the days. (*Id.*) Mr. Cash stated that sometimes he required multiple phone call reminders in order

8  to keep appointments. (AR 45.)

9    **C. Vocational Expert Testimony**

10     Vocational Expert Dr. Gerald Belchick testified by phone the hearing. (AR 46.) The ALJ

11  posed a hypothetical to the VE asking whether there would be work for a "younger individual with

12  a high school education and no past work, who's limited to light work; but with standing and

13  walking limited to two hours per day; occasional pushing and pulling with foot controls;

14  occasional postural changes; occasional climbing of stairs and ramps; no exposure to hazards or

15  unprotected heights; and a limitation to non-public, simple, repetitive tasks." (AR 46.)

16     Dr. Belchick said that such a person could not do light work because he or she could stand for

17  only two hours in an eight hour day. (AR 46.) The person would be restricted to sedentary work

18  with other restrictions. (AR 47.) Dr. Belchick stated that a person with no past relevant work

19  experience could perform jobs that are unskilled, simple, repetitive, and sedentary in nature. (AR

20  47.)

21     Dr. Belchick testified that such a person could work as a "bench assembler" (DOT code

22  706.684-022) or a packager (DOT code 920.587-018). (AR 47-48.) Dr. Belchick testified that

23  there were approximately 58,000 assembler jobs nationally and 1,700 locally. (AR 48.) He

24  testified that there were 13,000 packager jobs nationally and 1,100 locally. (AR 48.) Dr. Belchick

25  affirmed that these positions had no public contact. (AR 48.)

26     Finally, the ALJ asked Dr. Belchick whether if the person had a marked limitation in doing

27  simple tasks would he or she be precluded from working these jobs. (AR 48.) Dr. Belchick

28  responded that a "marked" limitation would be "by definition" disabling. (AR 48.)

United States District Court
Northern District of California

1    Mr. Cash's attorney then posed a hypothetical question to the VE, asking whether any jobs

2    would exist for an individual who was unable to be punctual or meet the restrictions of attendance

3    (AR 49.) Dr. Belchick responded that the answer to that question depended on the frequency of the

4    late appearances and missed days and that the "general consensus" is that missing more than one

5    day a month at an unskilled job is not acceptable. (AR 49.)

6       **D. Administrative Findings**

7       Applying the sequential evaluative process, the ALJ held that Mr. Cash "has not been under a

8    disability, as defined in the Social Security Act, since August 31, 2011, the date the application

9    was filed." (AR 23.)

10      At Step One, the ALJ found that Mr. Cash had not engaged in substantial gainful activity since

11   August 31, 2011, the date of his application. (AR 13.)

12      At Step Two, the ALJ found that Mr. Cash had the following severe impairments: "peripheral

13   neuropathy; status post 1989 gunshot wound to both thighs and left lower leg with fractures and

14   open reduction, internal fixation; posttraumatic stress disorder; and polysubstance abuse." (AR

15   13.)

16      At Step Three, the ALJ found that Mr. Cash did not have an impairment or combination of

17   impairments that met or medically equaled the listings 1.02 and 11.14. (AR 13-14.) In making this

18   determination, the ALJ found that the medical evidence of record did not support a finding that the

19   history of left lower leg fractures were characterized by gross anatomical deformity and chronic

20   joint pain and stiffness with limitation of motion or abnormal motion, and joint space narrowing,

21   bony destruction, or ankylosis, as required under Listing 1.02. (AR 14.)

22      In addition, the ALJ found that the medical evidence did not support a finding that the

23   peripheral neuropathy was characterized by disorganization of motor function of two extremities,

24   resulting in sustained disturbances of gross and dexterous movements, or gait and station, as

25   required under Listing 11.14. (AR 14.)

26      The ALJ also found that the severity of Mr. Cash's mental impairments, considered singly and

27   in combination, did not meet or medically equal the listings 12.06 and 12.09. (AR 14.) The ALJ

28   found that Mr. Cash did not meet the "paragraph B" criteria. (*Id.*) To satisfy the "paragraph B"

United States District Court
Northern District of California

criteria, the mental impairment must result in at least two of the following: marked restrictions on activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, and pace; or repeated episodes of decompensation, each of extended duration. (AR 14.)

First, the ALJ found that Mr. Cash had only mild restrictions on activities of daily living. (AR 14.) In reaching this decision, the ALJ relied on Mr. Cash's report to Dr. Lewis that he was able to attend to his personal care, vacuum, and do the dishes. (*Id*.) The ALJ also considered Mr. Cash's testimony that he was able to take public transportation independently. (AR 14.)

Second, the ALJ found Mr. Cash had only moderate difficulties in social functioning. (AR 14.) The ALJ noted that while Mr. Cash reported "isolating tendencies," Mr. Cash also testified that he enjoys seeing his mother and a couple of friends and that he "expressed great satisfaction" in his relationship with his daughter and grandchildren. (AR 14.)

Third, the ALJ found that Mr. Cash had moderate difficulties with regard to concentration, persistence, and pace. (AR 14.) In so finding, the ALJ looked to the following: Mr. Cash's testimony that he often gets days of appointments "mixed up" and Dr. Khalsa's assessment that Mr. Cash had a severe impairment in attention and concentration. (*Id*.) The ALJ then mentioned Dr. Khalsa's statement that Mr. Cash appeared "completely unmotivated for treatment." (*Id*.) The ALJ found that at the hearing Mr. Cash had denied vegetative symptoms of depression and that Mr. Cash had been able to follow the hearing without apparent difficulty. (AR 14.) The ALJ found that Mr. Cash experienced no episodes of decompensation of extended duration. (AR 14.)

The ALJ concluded that because Mr. Cash's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied. (AR 15.)

In addition, the ALJ found that Mr. Cash did not meet the "paragraph C" criteria of listing 12.06, which requires an anxiety-related disorder resulting in a complete inability to function independently outside the area of one's home. (AR 15.) The ALJ found that the evidence failed to establish the presence of "paragraph C" criteria of listing 12.06. (AR 15.)

At Step Four, the ALJ found Mr. Cash had the residual functional capacity to perform light

1  work as defined in 20 CFR § 416.967(b) with the following limitations:  lifting and/or carrying 10

2  pounds frequently and 20 pounds occasionally; standing and/or walking for two hours and sitting

3  for six hours in an eight-hour workday; occasionally using bilateral lower extremity foot controls;

4  and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (AR 15.) The

5  ALJ found that Mr. Cash must avoid unprotected heights and concentrated exposure to hazards.

6  (AR 15.) The ALJ concluded that Mr. Cash was capable of performing "simple, repetitive tasks in

7  non-public work settings." (*Id*.)

8      In making this finding, the ALJ considered all of the plaintiff's symptoms and how consistent

9  they were with the objective medical reports and other evidence based on the requirements of 20

10  C.F.R. § 416.929 and Social Security Rulings 96-4p and 96-7p. (AR 15.) He also considered

11  opinion evidence under 20 C.F.R. § 416.927 and Social Security Rulings 96-2p, 96-5p, 96-6p, and

12  06-3p. (*Id*.) The ALJ followed a two-step process, first determining whether there was a medically

13  determinable physical or mental impairment that reasonably could be expected to produce the

14  plaintiff's pain and other symptoms, and then evaluating the intensity, persistence, and limiting

15  effects of the symptoms to determine the extent that they limited Mr. Cash's ability to do basic

16  work activities. (*Id*.) For the second part, whenever Mr. Cash's statements about the intensity or

17  functionally limiting effects of pain or other symptoms were not substantiated by objective

18  medical evidence, the ALJ made findings on the credibility of the statements "based on a

19  consideration of the entire record." (*Id*.)

20      The ALJ then reviewed the medical evidence in the record. In terms of Mr. Cash's physical

21  limitations, the ALJ placed great weight on the opinion of state agency medical consultant Dr.

22  Chiang and substantial weight on the opinion of State Agency Medical Evaluator, Dr. Lewis. (AR

23  17.) The ALJ found these opinions to be reasonable and generally consistent with the evidence of

24  record, including Mr. Cash's testimony. (AR 17-18.)

25      In terms of Mr. Cash's mental impairments, the ALJ discussed at length the mental health

26  evidence in the record. The ALJ stated that he gave little weight to the following: the opinions of

27  the CJMH and Santa Rita Jail Mental Health providers; Dr. Khalsa's examination; Dr. Shefayee's

28  Mental Impairment Questionnaire; and Susan Dawkins's evaluation. (AR 18-19.)

United States District Court
Northern District of California

The ALJ first discussed the CJHM treatment records from August, 2011. (AR 18.) The ALJ noted Mr. Cash's diagnosis of post-traumatic stress disorder and inability to sleep due to nightmares as well as flashbacks of childhood trauma and bereavement over the loss of loved ones. (*Id*.) The ALJ referenced the treatments notes that Mr. Cash refused to attend a psychiatric appointment, was interested only in receiving SSI benefits, and was on minimal medication for depression and insomnia. (AR 18.) Later in the findings, the ALJ reviewed the CJMH records from January 2013. (AR 19.) The ALJ referenced the clinician's diagnosis of "opioid-induced mood disorder and opioid dependence." (*Id*.) The ALJ cited the findings that Mr. Cash exhibited a linear, organized thought process, reported a "little" depression, and said that he was "alright" when he was taking his medication. (*Id*.)

The ALJ referenced the progress notes from Santa Rita Jail that Mr. Cash was compliant with his medications and reported no side effects and no suicidal or homicidal ideation. (AR 19.) The ALJ noted that Mr. Cash was reported to have participated very minimally in counseling and shared very little insight and that Mr. Cash seemed worried about his methadone. (AR 18.)

The ALJ then discussed Dr. Khalsa's October 2011 evaluation. (AR 18.) The ALJ referenced the portions of Dr. Khalsa's report where Mr. Cash was described as "expressionless" and exhibiting blocked or circumstantial thought flow and poor insight and judgment and appeared unmotivated for treatment. (*Id*.) The ALJ noted that the tests that Dr. Khalsa administered showed Mr. Cash (1) was in the "extremely low range" in memory testing and in language and visual/spatial abilities and (2) had marked impairments in executive functioning. (*Id*.) The ALJ referenced Dr. Khalsa's diagnosis: "History of Traumatic Brain Injury"; "Bipolar I disorder, Single Manic Episode, most recent episode depressed with psychotic features"; "Delusional Disorder"; "Posttraumatic Stress Disorder, Chronic"; "Generalized Anxiety Disorder"; and a "Cognitive Disorder Not otherwise Specified." The ALJ reported Dr. Khalsa's finding that Mr. Cash had a GAF score of 35, suggesting severe mental limitations. (*Id*.) The ALJ noted Dr. Khalsa's finding that Mr. Cash's prognosis was "extremely poor." (AR 19.) The ALJ stated that Dr. Khalsa had not offered an opinion regarding the claimant's mental functioning. (*Id*.) Finally, the ALJ noted that Dr. Khalsa's report did not discuss Mr. Cash's use of methadone. (*Id*. at n.1.)

1    The ALJ rejected Dr. Khalsa's diagnosis of "history of brain trauma" because the diagnosis was

2    apparently based on Mr. Cash's reported history, but there was no evidence of such a diagnosis in

3    the years of prison medical records. (AR 20.)

4         The ALJ then referenced Dr. Shefayee's Mental Impairment Questionnaire. The ALJ noted Dr.

5    Shefayee's findings that Mr. Cash had marked or extreme impairment in most areas of work-

6    related mental functioning and was "completely unable to function independently outside of the

7    home." (AR 19.)

8         Finally, the ALJ referenced the evaluation of social worker Susan Dawkins. (AR 19.) The ALJ

9    stated that Ms. Dawkins's psychosocial evaluation of Mr. Cash primarily contained Mr. Cash's

10   subjective complaints and Ms. Dawkins's interpretation of his past treatment, with no cognitive

11   functioning tests or mental status examination. (*Id*.) The ALJ also noted that Ms. Dawkins

12   diagnosed dementia due to head trauma, PTSD, major depression, and polysubstance abuse in full

13   sustained remission, and that she opined that Mr. Cash was a "severely impaired individual" who

14   could not meet the demands of even the simplest occupation. (*Id*.) The ALJ accorded little weight

15   to Ms. Dawkins's opinion, finding that her treatment of Mr. Cash was brief, her opinion seemed to

16   merely document his subjective allegations, and her opinion was not based on medically accepted

17   diagnostic or clinical techniques. (AR 20.) The ALJ also stated that Ms. Dawkins was not an

18   acceptable medical source under the regulations. (*Id*.)

19        In contrast to the opinions above, the ALJ accorded great weight to the opinion of state agency

20   psychiatric consultant Dr. Haroun. (AR 20.) The ALJ first quoted the analysis section of Dr.

21   Haroun's report in its entirety. (*Id*.) The ALJ then found Dr. Haroun's opinion of Mr. Cash's

22   ability to perform non-public, simple unskilled tasks to be consistent with the longitudinal medical

23   evidence of record, including (1) Mr. Cash's statements to providers that he was doing better on

24   medication, (2) Mr. Cash's lack of consistent effort to accept offered mental health treatment, and

25   (3) Mr. Cash's testimony regarding the great pleasure he took in his familial relationships. (AR

26   20.) The ALJ also found Dr. Shefayee's opinion to be inconsistent with this evidence. (*Id*.)

27        The ALJ accorded little weight to the opinions of Dr. Graves-Matthews and LMFT

28   Jammalamadaka because they saw Mr. Cash only once and on the same day. (AR 20.) The ALJ

United States District Court
Northern District of California

1    found that their opinions about Mr. Cash's depressed and anxious mood were inconsistent with

2    Mr. Cash's statements a month later that he was doing better on medication, and with the evidence

3    in the record that Mr. Cash had rejected mental health treatment and his testimony at the hearing

4    that he took pleasure in his familial relationships. (AR 20-21.)

5         Based on all of the evidence, the ALJ found that the plaintiff's "medically determinable

6    impairments could reasonably be expected to cause the alleged symptoms; however, [the

7    plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms

8    [were] far from credible." (AR 21.) The ALJ noted inconsistencies between Mr. Cash's reports of

9    his drug use to Dr. Khalsa, Dr. Shefayee, and Ms. Dawkins, his urine sample from November

10   2012, and his testimony at the hearing. (AR 21.) The ALJ found that Mr. Cash had not been

11   candid about his drug use to Dr. Khalsa, Dr. Shefayee, and Ms. Dawkins. The ALJ also concluded

12   from Mr. Cash's "unreliable reports of his drug use that the cognitive and attention problems

13   noted in the evaluations may well have been due to his substance use about which he has not been

14   candid." (AR 21.)

15        Additionally, the ALJ found a lack of credibility based on inconsistencies between Mr. Cash's

16   report on the degree of his physical functionality at the hearing and his report to his consultative

17   internist, Dr. Lewis. (AR 21.) The ALJ also noted an inconsistency between (1) Mr. Cash's report

18   of isolation and worthlessness in May 2012, and (2) his testimony at the hearing that he enjoyed

19   his relationship with his mother, daughter, grandchildren, and friends, and his denial of feelings of

20   worthlessness and hopelessness. (AR 21.) While the ALJ did not question the seriousness of Mr.

21   Cash's injuries, the ALJ found that the evidence that Mr. Cash had never worked suggested a lack

22   of motivation to work. (AR 21.)

23        The ALJ found that Dr. Haroun's residual functional capacity assessment was supported by

24   the longitudinal evidence. To the extent that the other objective findings and opinions in the record

25   contradicted Dr. Haroun's residual functional capacity assessment, the ALJ found them to be

26   "suspect due to [Mr. Cash's] poor credibility and his probable drug use." (AR 21.)

27        At Step Five, the ALJ found that Mr. Cash had no past relevant work. (AR 21.) The ALJ

28   concluded that considering Mr. Cash's age, education, work experience, and residual functional

United States District Court
Northern District of California

1   capacity, there were jobs that exist in significant numbers in the national economy that Mr. Cash
2   could perform. (AR 22.) Based on the testimony of the VE, the ALJ found that Mr. Cash could
3   work as a bench assembler or packager. While the Dictionary of Occupational Titles classifies
4   these jobs as light work, the VE testified, and the ALJ accepted, that these jobs could be
5   performed at the sedentary exertional level. (*Id.*)

6     The ALJ discounted — as not supported by the record — the hypothetical put forward by Mr.
7   Cash's counsel for an individual with marked limitations in performing simple tasks or an extreme
8   problems with attendance. (AR 23.) The ALJ concluded that Mr. Cash was not disabled from
9   August 31, 2011 to the date the application was filed. (*Id.*)

10   **ANALYSIS**
11   **I. STANDARD OF REVIEW**

12     Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the
13   Commissioner if the plaintiff initiates the suit within sixty days of the decision. District courts
14   may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal
15   error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g);
16   *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence
17   means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a
18   reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d
19   1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's
20   decision and a different outcome, the court must defer to the ALJ's decision and may not
21   substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir.
22   1999).

23   **II. APPLICABLE LAW: FIVE STEPS TO DETERMINE DISABILITY**

24     An SSI claimant is disabled if (1) he suffers from a "medically determinable physical or
25   mental impairment which can be expected to result in death or which has lasted or can be expected
26   to last for a continuous period of not less than twelve months," and (2) the "impairment or
27   impairments are of such severity that he is not only unable to do his previous work but cannot,
28   considering his age, education, and work experience, engage in any other kind of substantial

United States District Court
Northern District of California

gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

There is a five-step analysis for determining whether a claimant is disabled within the meaning

of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(I).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant. At step five, the burden

shifts to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). When

determining whether a claimant is disabled, the ALJ must consider each medical opinion in the

record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*,

No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). As a rule, the Social

Security Administration favors opinions of treating physicians over non-treating physicians. *See*

*Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  The Social

Security Administration defers to treating physicians because they are employed to cure and have

a greater opportunity to know and observe their patients. *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d

United States District Court
Northern District of California

1   595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). The

2   conclusions of the treating physician are not necessarily conclusive, however. *Id.* (citing

3   *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759,

4   761-62 & n.7. (9th Cir. 1989)).

5   **III. APPLICATION**

6   Mr. Cash asserts that the ALJ erred by (1) not finding a cognitive disorder and an affective

7   disorder as severe impairments at Step Two, (2) improperly rejecting treating and examining

8   sources in favor of the opinion of a non-examining source in determining Mr. Cash's residual

9   functional capacity, (3) failing to consider the entire record when evaluating Mr. Cash's credibility

10  and failing to provide clear and convincing reasons for finding Mr. Cash not credible, (4) relying

11  on an incomplete hypothetical to find Mr. Cash not disabled, and (5) finding that Mr. Cash's

12  impairments did not meet or equal a listings 12.02, 12.04 and 12.06. (MSJ, ECF No. 17).

13  **A. The Failure to Find Cognitive and Affective Disorders as Severe Impairments Was**
14  **Not Error**

15  At Step Two of the five-step sequential inquiry, the Commissioner determines whether the

16  claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*,

17  482 U.S. 137, 140. The ALJ found Mr. Cash had the following severe impairments: peripheral

18  neuropathy; status post 1989 gunshot wound to both thighs and left lower leg with fractures and

19  open reduction and internal fixation; PTSD; and polysubstance abuse. (AR 13.) Mr. Cash argues

20  that the ALJ also should have found that he had cognitive and affective disorders as severe

21  impairments. (MSJ, ECF 17.)

22  At Step Two, the burden is on the plaintiff to prove that his impairments are severe. *See*

23  *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996). Mr. Cash has not met the burden of

24  demonstrating that his alleged cognitive and affective disorders are "severe." An impairment is not

25  "severe" unless it "significantly limits [the claimant's] physical or mental ability to do basic work

26  activities." 20 C.F.R. §§ 404.1520(c), 404.1521(a)(1991). Basic work activities are "abilities and

27  aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting,

28  pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 140.1521(b).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  First, Mr. Cash's application for social security benefits states that his mental disabilities are

2 depression and PTSD. (AR 176.) He does not list a "cognitive disorder" or an "affective disorder"

3 as a disability. (*Id.*) The only references in the medical records to a "cognitive disorder" are from

4 Dr. Khalsa and from Ms. Dawkins. (AR 411, 738). While Dr. Khalsa mentioned a "cognitive

5 disorder" as one of the "likely" diagnoses, the Barona Estimate test results notes say only that

6 there was an indication of a "potential cognitive disorder." (AR 411.)

7  Similarly, when Ms. Dawkins met with Mr. Cash for the first time on March 13, 2013, her

8 notes do not include a diagnosis of a "cognitive disorder." (AR 736.) Only in her second meeting

9 with Mr. Cash on March 20, 2013 does Ms. Dawkins add a diagnosis of a cognitive disorder, and

10 even then, it is not indicated as a "primary diagnosis." (AR 738.) The only reference in the

11 medical records to Mr. Cash's having an "adjustment disorder" was from his medical records in

12 1988 and 1989, which substantially predate his disability claim and also appears to be associated

13 with his bereavement at the loss of his loved ones. (AR 345-47.)

14  The ALJ did find that Mr. Cash has a medically severe combination of impairments. (AR 13.)

15 Any failure to include a "cognitive disorder" or an "adjustment disorder" was not legally required;

16 an ALJ does not have to justify why a claimant fails to meet the criteria for each and every listing.

17 *See Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990).

18 **B. The ALJ Improperly Rejected Opinions of Treating and Examining Sources in Favor**

19  **of the Opinion of a Non-Examining Consultant**

20  In making his residual functional capacity determination, the ALJ accorded great weight to the

21 non-examining state agency psychiatric consultant, Dr. Haroun. (AR 19.) The ALJ accorded little

22 weight to the opinions of treatment providers Dr. Graves-Matthews, LMFT Jammalamadaka, Dr.

23 Shefayee, and Susan Dawkins. (AR 18-19.) The ALJ also accorded little weight to examining

24 psychologist Dr. Khalsa. (AR 18.) Mr. Cash asserts that the ALJ erred by rejecting the opinions of

25 the treatment providers and the examining physician without providing specific, legitimate reasons

26 supported by substantial evidence. (MSJ, ECF No. 17 at 11-19.) Mr. Cash further argues that the

27 ALJ erred by assigning the greatest weight to the opinion of a non-examining medical consultant

28 whose opinion was not supported by the record as a whole. (*Id.* at 19-22.)

1

### 1. The ALJ Erred by Discounting the Opinion of CJMH Treatment Providers Dr.

2

### Graves-Matthews, LMFT Jammalamadaka, and Dr. Shefayee

3        Mr. Cash first argues that the ALJ improperly discounted the opinion of treatment providers

4   Dr. Graves-Matthews and LMFT Jammalamadaka. (Motion, ECF No. 17 at 12-14.)

5        The ALJ gave "little weight" to the August 2011 findings of Dr. Graves-Matthews and LMFT

6   Jammalamadaka in the Medical Source Statement that Mr. Cash has a diagnosis of PTSD and that

7   Mr. Cash experienced "marked" levels in restrictions of the activities of daily living, difficulties in

8   maintaining social functioning, and deficiencies in concentration, persistence, and pace. (AR 334.)

9   Mr. Cash also argues that the ALJ erred by rejecting the opinion of Dr. Shefayee without stating

10  any specific and legitimate reasons for having done so. (MSJ, ECF No. 17 at 14-16.)

11       In determining whether a claimant is disabled, the ALJ must consider each medical opinion in

12  the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v.*

13  *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the

14  Social Security Administration favors the opinion of a treating physician over non-treating

15  physicians." *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527). "The opinion of a treating

16  physician is given deference because 'he is employed to cure and has a greater opportunity to

17  know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

18  F.3d 595, 600 (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

19  "However, the opinion of the treating physician is not necessarily conclusive as to either the

20  physical condition or the ultimate issue of disability." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d

21  747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)). "If

22  a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory

23  diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

24  record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. §

25  404.1527(d)(2)).

26       "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-

27  supported' or because it is inconsistent with other substantial evidence in the record, the [Social

28  Security] Administration considers specified factors in determining the weight it will be given."

1    *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of

2    examination' by the treating physician; and the 'nature and extent of the treatment relationship'

3    between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(b)(2)(i)-(ii)).

4    "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

5    treating physician, include the amount of relevant evidence that supports the opinion and the

6    quality of the explanation provided; the consistency of the medical opinion with the record as a

7    whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the

8    degree of understanding a physician has of the [Social Security] Administration's 'disability

9    programs and their evidentiary requirements' and the degree of his or her familiarity with other

10   information in the case record." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if

11   the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference.

12   *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating

13   source's medical opinion will be entitled to the greatest weight and should be adopted, even if it

14   does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

15        The ALJ gave "little weight" to the opinions of Dr. Graves-Matthews and LMFT

16   Jammalamadaka because (1) they saw Mr. Cash only once while he was incarcerated, (2) LMFT

17   Jammalamadaka performed the mental status examination instead of Dr. Graves-Matthews, (3)

18   their opinions were inconsistent with Mr. Cash's statements a month later that he was doing better,

19   and (4) their opinions were inconsistent with Mr. Cash's testimony that he takes pleasure in his

20   family relationships. (AR 20-21.)

21        The Medical Source Statement states that at the time it was completed, Dr. Graves-Matthews

22   and LMFT Jammalamadaka met with Mr. Cash only one time in jail. (AR 334.) The ALJ

23   appropriately considered the length of treatment when determining the credibility of a medical

24   source. 20 C.F.R. § 404.1527(b)(2)(1).

25        An ALJ may give an opinion less weight where the statement is not "well-supported by

26   medically acceptable clinical and laboratory diagnostic techniques." *Orn*, 495 F.3d at 631 (quoting

27   20 C.F.R. § 404.1527(d)(2)). The ALJ said that one reason he accorded little weight to the opinion

28   was that Dr. Graves-Matthews did not perform a mental status examination. (AR 20.) This

United States District Court
Northern District of California

1  finding, however, ignores that LMFT Jammalamadaka, who collaborated on the Medical Source

2  Statement with Dr. Grave-Matthews, performed a mental status examination on Mr. Cash that day.

3  (AR 343.) Thus, the Medical Source Statement was based on an examination, and it was error for

4  the ALJ to have accorded it less weight on that basis. (AR 343.)

5      The remaining issue is whether the ALJ should have accorded the findings in the Medical

6  Source Statement more weight because they were consistent with the findings of other treatment

7  providers. *Orn*, 495 F.3d at 631 (unless a treatment provider's findings are "inconsistent with the

8  other substantial evidence in [the] case record, [they will be given] controlling weight.") Here, Dr.

9  Graves-Matthews found that Mr. Cash had marked restrictions on activities of daily living, social

10 functioning, concentration, persistence, and pace. (AR 334.) These findings were corroborated by

11 Dr. Shefayee's findings in his MIQ completed nearly a year later. (AR 600.) The consistency in

12 both treating physicians' reports was a factor the ALJ should have considered when deciding what

13 weight to give the opinions of Dr. Graves-Matthews and LMFT Jammalamadaka. *Orn*, 495 F.3d at

14 631.

15     The ALJ relies on records dated to October 11, 2011 to assert that Mr. Cash reported doing

16 "fine" on minimal medication and seemed "stable and calm," and that prison personnel had no

17 concerns. (AR 420-421.) The same record notes that Mr. Cash "participate[d] very minimally in

18 counseling and seem[ed] to share very little insight." (AR 422.)

19     The ALJ also gave less weight to the opinions of Dr. Grave-Matthews and LMFT

20 Jammalamadaka because he found them inconsistent with Mr. Cash's testimony that he took

21 pleasure in his familial relationships. (AR 21, 42.) As the Ninth Circuit said in *Vertigan v. Halter*,

22 "the mere fact that a plaintiff carries on certain daily activities, such as grocery shopping, driving a

23 car, or limited walking for exercise, does not in any way detract from the credibility as to [one's]

24 overall disability. One does not need to be utterly incapacitated in order to be disabled." 260 F.3d

25 1044, 1050 (9th Cir. 2001) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also*

26 *Cooper v. Bowen*, 815 F.2d 597, 603 (9th Cir. 1987) (noting that a disability claimant need not

27 "vegetate in a dark room" in order to be deemed eligible for benefits).

28     The ALJ also erred by disregarding the opinion of treating physician Dr. Shefayee. Dr.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Shefayee is a psychiatrist with CJMH who treated Mr. Cash for 20 to 60 minutes monthly while

2  Mr. Cash was incarcerated. (AR 597.) Dr. Shefayee diagnosed Mr. Cash with PTSD and

3  concluded that Mr. Cash had marked functional limitations in maintaining social functioning,

4  concentration, persistence, and pace, as well as extreme limitations in activities of daily living.

5  (AR 601.) The ALJ's order states that he gave little weight to these findings contained in Dr.

6  Shefayee's Mental Impairment Questionnaire. (AR 19.) "If the ALJ wishes to disregard the

7  opinion of the treating physician, he or she must make findings setting forth specific, legitimate

8  reasons for doing so that are based on substantial evidence in the record." *Orn*, 495 F.3d at 633;

9  *see also Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).

10      The ALJ does not state any specific reasons for rejecting the opinion of treating physician Dr.

11  Shefayee, other than that they were "inconsistent" with the opinion of non-examining medical

12  consultant, Dr. Haroun, as well as with Mr. Cash's statements that he was "doing better" on

13  medication and his statements that he took pleasure in his familiar relationships. (AR 19-20.)

14  Opinions of non-examining doctors alone, however, cannot provide substantial evidence to justify

15  rejecting either a treating or examining physician's opinion. *See Morgan,* 169 F.3d at 602. Also, as

16  Dr. Shefayee treated Mr. Cash over time, he was aware of Mr. Cash's medical regimen and its

17  effect on Mr. Cash as indicated in his report.  (AR 597, noting Remeron prescription and the side

18  effect of "spac[ing] out.") Additionally, Dr. Shefayee's findings of marked limitations on

19  concentration, pace, and persistence were corroborated by treatment providers Dr. Grave-

20  Matthews and LMFT Jammalamadaka. (AR 344, 600.) The ALJ therefore erred by rejecting Dr.

21  Shefayee's opinion.

22            **2. The ALJ Inappropriately Discounted Dr. Khalsa's Opinion**

23      Mr. Cash next argues that the ALJ improperly rejected the opinion of examining  physician Dr.

24  Khalsa. (MSJ, ECF No. 17 at 18-19.) The ALJ gave "little weight" to Dr. Khalsa's opinion. (AR

25  18-19.) On October 4, 2011, Dr. Khalsa interviewed Mr. Cash and administered a battery of tests

26  to him over a two-hour period. (AR 409-11.) Dr. Khalsa diagnosed Mr. Cash with a "History of

27  Traumatic Brain Injury", "Bipolar I disorder, Single Manic Episode, most recent episode

28  depressed with psychotic features", "Delusional Disorder", "Posttraumatic Stress Disorder,

1   Chronic", "Generalized Anxiety Disorder", and a "Cognitive Disorder NOS." (*Id.*)

2       The ALJ's opinion states that "Dr. Khalsa did not offer an opinion regarding [Mr. Cash's]

3   mental function limitations." (AR 19.) But Dr. Khalsa noted (1) marked restrictions on Mr. Cash's

4   ability to understand, remember, and carry out both detailed and very short and simple instructions

5   and (2) extreme restrictions on Mr. Cash's ability to maintain attention and concentration for two

6   hours, to perform at a consistent pace without an unreasonable number and length of rest periods,

7   to get along and work with others, to interact appropriately with the general public, to accept

8   instructions and respond appropriately to criticism from supervisors, to respond appropriately to

9   changes in a routine work setting and deal with normal work stressors, to complete a normal

10  workday and workweek without interruptions from psychologically based symptoms, and to

11  maintain regular attendance and be punctual within customary, usually strict tolerances. (AR 415.)

12      The other reason that the ALJ provides in his opinion for giving "little weight" to Dr. Khalsa's

13  evaluation was his rejection of Dr. Khalsa's finding of a "history of traumatic brain injury." (AR

14  20.) Dr. Khalsa's finding of a "history of a traumatic brain injury" is not inconsistent with other

15  medical findings in the record regarding Mr. Cash's having been shot in the head and having

16  suffered head trauma. (AR 334 (shot in the head), 342 (same), 597 (head trauma).)  Because Dr.

17  Khalsa's finding is supported by the medical evidence, it is not a reason to accord Dr. Khalsa's

18  opinion less weight.

19      Finally, the ALJ notes that "oddly, [Dr. Khalsa] did not diagnose methadone dependence or

20  discuss possible limitations due to methadone use," even though Mr. Cash reported that he had

21  been on methadone maintenance. (AR 18, n.1.) The ALJ, however, does not rely on this as a

22  specific reason for rejecting Dr. Khalsa's report. The ALJ rejected Dr. Khalsa's opinion in favor

23  Dr. Haroun's opinion. Again, opinions of non-examining doctors alone cannot provide substantial

24  evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan,* 169

25  F.3d at 602. The ALJ therefore erred by giving little weight Dr. Khalsa's opinion.

26          ### 3.  *The ALJ Did Not Err by Giving Less Weight to the Opinion of LCSW Dawkins*

27      Mr. Cash next argues that the ALJ erred by discounting the opinion of LCSW Susan Dawkins.

28  (MSJ, ECF No. 17 at 17-18.) The ALJ accorded Ms. Dawkins's opinion little weight because her

United States District Court
Northern District of California

1   treatment of Mr. Cash was brief, her evaluation appeared to be based on Mr. Cash's subjective

2   allegations rather than or medically accepted diagnostic or clinical techniques, and she was not an

3   acceptable medical source under the regulations. (AR 20.)

4   While Ms. Dawkins is not "an acceptable medical source," she is a behavioral health clinician

5   II at the Alameda County Public Health Department, and as such, she fits within the category of

6   acceptable "other sources." (AR 745.) *See also* SSR 06-03p. Information from "other sources"

7   cannot establish the existence of a medically determinable impairment; there must be evidence

8   from an "acceptable medical source" for that purpose. 20 C.F.R. 416.913(d). The opinions of

9   public social welfare agency personnel are acceptable, however, to show the severity of a

10   claimant's impairment or how it affects their ability to work. 20 C.F.R. 416.913(d); SSR 06-03p.

11   Social Security Regulation 06-03p requires that the ALJ consider all relevant evidence

12   including "other sources." SSR 06-03. The regulation notes that "[t]he weight to which such

13   evidence may be entitled will vary according to the particular facts of the case, the source of the

14   opinion, including that source's qualifications, the issue(s) that the opinion is about," and other

15   factors. *Id*. These factors include (1) how long the source has known and how frequently the

16   source has seen the individual, (2) how consistent the opinion is with other evidence, (3) the

17   degree to which the source presents relevant evidence to support an opinion, (4) how well the

18   source explains the opinion, and (5) whether the source has a specialty or area of expertise related

19   to the individual's impairments. *Id.*

20   Under the regulations, the ALJ appropriately discounted Ms. Dawkins's opinion as a basis for

21   finding that Mr. Cash had a medically determinable impairment. The ALJ also was permitted to

22   give Ms. Dawkins's opinion less weight based on the short duration of her treatment of Mr. Cash,

23   as they only met on three occasions. SSR 06-03; (AR 736-41.)

24   The ALJ also discounted Ms. Dawkins's opinion because she appeared to rely on Mr. Cash's

25   own symptoms. (AR 20.) Ms. Dawkins's report indicates that her opinions were based on Mr.

26   Cash's reporting and her own clinical observations. (AR 742-745.) They do not, however, appear

27   to have been the result of any clinical or other testing or techniques. The ALJ was permitted to

28   consider the evidence underlying Ms. Dawkins's opinions. On the record as a whole then, the ALJ

United States District Court
Northern District of California

1    was not required to give more than a little weight to the opinion of Ms. Dawkins. *See* SSR 06-03p.

2    **C. The ALJ Erred by Inappropriately According the Greatest Weight to a Non-**

3    **Examining Medical Consultant**

4    The ALJ accorded the greatest weight to the opinion of non-examining medical consultant Dr.

5    Haroun. Dr. Haroun reviewed Mr. Cash's mental health records for July through November 2011

6    and Dr. Khalsa's report. (AR 54-55, 57.) In his analysis, Dr. Haroun notes that Mr. Cash had

7    received "minimal psychiatric treatment." (AR 58.)  On the basis of his record review, Dr. Haroun

8    found that Mr. Cash "should be able to perform at least simple unskilled tasks in a non-public

9    setting." (AR 20.)

10   The ALJ erred by according controlling weight to the opinion of non-examining medical

11   consultant Dr. Haroun over the opinions of Mr. Cash's treatment providers and the examining

12   physician as discussed above. The opinion of a non-examining medical advisor cannot by itself

13   constitute substantial evidence that justifies the rejection of the opinion of an examining or

14   treating physician. *Morgan*, 169 F.3d at 602. Here, the ALJ improperly used the one opinion from

15   a non-examining medical advisor as a justification to reject all of the treating physicians'

16   diagnoses of Mr. Cash. (AR 58.)

17   Moreover, while the ALJ reasoned that Dr. Haroun's opinion was consistent with the

18   longitudinal evidence in the record, the ALJ inappropriately discounted the longitudinal treatment

19   evidence of Dr. Shefayee as discussed above.

20   Dr. Haroun's differing conclusions on Mr. Cash's limitations are based on the same evidence

21   and findings as the treating physicians. (AR 58.) Where the findings relied on by the non-

22   examining physician are the same as the treating physician's and only the conclusions differ, the

23   ALJ must set forth specific, legitimate reasons based on substantial evidence in the record for

24   disregarding the findings of the treating physician. *Orn*, 495 F.3d at 632. As discussed above, the

25   ALJ did not set out those reasons. *See also* 20 C.F.R. 404.1527 (setting out hierarchy for

26   consideration of medical evidence). The ALJ erred by according great weight to the opinion of

27   non-examining medical consultant Dr. Haroun over the opinions of the treating and examining

28   physicians.

United States District Court
Northern District of California

**D. The ALJ Erred by Failing to Find That Mr. Cash's Impairments Did Not Meet or Equal a Listing**

The ALJ found that the severity of Mr. Cash's mental impairments did not meet or medically equal the criteria of listings 12.06 and 12.09. (AR 14.) In making this finding, the ALJ found that Mr. Cash did not meet the "Paragraph B" criteria, which require at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining social concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (AR 14.)

Here, the ALJ found that Mr. Cash had only a mild restriction on activities of daily living because he told consultative internist Dr. Lewis that he tended to his personal care, vacuumed, and took public transportation independently. (AR 14.) But his testimony states that he does not help his daughter with any chores, including laundry, cooking, or shopping. (AR 39-40.) Furthermore, his testimony also shows that he takes public transportation only when he has no other choice, and other than that, he cannot walk more than two blocks without stopping to rest. (AR 34, 36.) Additionally, Dr. Shefayee concluded that Mr. Cash has extreme restrictions on his activities of daily living, and Dr. Graves-Matthews concluded that Mr. Cash had marked restrictions on activities of daily living. (AR 333-334.) Based on the record as a whole, the ALJ erred by finding that Mr. Cash had only mild restrictions in activities of daily living. Mr. Cash's testimony and the conclusion of two treating physicians show that he at least had marked limitations in activities of daily living.

The ALJ also found that Mr. Cash had only moderate difficulties in social functioning because he enjoys his familial relationships with his mother, daughter, and grandchildren. (AR 14.) As stated above, "the mere fact that a plaintiff carries on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from the credibility as to [one's] overall disability. One does not need to be utterly incapacitated in order to be disabled." *Vertigan*, 260 F.3d at 1050 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see Cohen v. Secretary of Dept. of Health & Human Servs.*, 964 F.2d 524, 530-31 (6th Cir. 1992) (ruling that a claimant should not be penalized for attempting to maintain some normalcy in

United States District Court
Northern District of California

1    her life); *Cooper v. Bowen*, 815 F.2d 597, 603 (9th Cir. 1987) (noting that a disability claimant

2    need not "vegetate in a dark room" in order to be deemed eligible for benefits.) Both Dr. Shefayee

3    and Dr. Grave-Matthews reported that Mr. Cash had marked restrictions in social functioning.

4    (AR 333, 600.) The testimony additionally shows that even though Mr. Cash enjoyed these

5    relationships, he stayed away from them and locked himself up in his room about six times a

6    month. (AR 40.) The ALJ erred by discrediting the treating physicians' opinions and finding that

7    Mr. Cash only had moderate limitations solely because he enjoyed being around his mother,

8    daughter, and grandchildren.

9        The ALJ also found that Mr. Cash had moderate difficulties in maintaining concentration,

10   persistence, and pace because he "denied vegetative symptoms of depression and was able to

11   follow the hearing without difficulty." (AR 14.)  In making this finding, the ALJ again disregarded

12   the opinions of Dr. Shefayee and Dr. Grave-Matthews, who found marked limitations, and Dr.

13   Khalsa, who found extreme limitations in maintaining concentration, persistence, and pace. (AR

14   333-334, 415, 600, 744.) The ALJ erred by rejecting all of these conclusions from credible

15   sources. Given that Mr. Cash meets at least two of the requirements under "paragraph B," the ALJ

16   erred by finding that he did not meet or medically equal a listing.

17   **E. The ALJ Erred by Relying on an Incomplete Hypothetical to Find Mr. Cash Not**

18   **Disabled**

19       The ALJ found that Mr. Cash has the residual functional capacity to perform light work with

20   physical limitations and that he was mentally limited to non-public, simple, repetitive tasks. (AR

21   15.) In coming to this conclusion, the ALJ relied on the answer from VE Dr. Belchick to the

22   hypothetical question that the ALJ posed to him. (AR 22.) The ALJ asked whether there would be

23   work for a "younger individual with a high school education and no past work, who's limited to

24   light work; but with standing and walking limited to two hours per day; occasional pushing and

25   pulling with foot controls; occasional postural changes; occasional climbing of stairs and ramps;

26   no exposure to hazards or unprotected heights; and a limitation to non-public, simple, repetitive

27   tasks." (AR 46.) The VE found that a person with the limitations set forth in the hypothetical

28   would be eligible to work as an assembler or packager. (AR 48.) The ALJ failed to include all of

United States District Court
Northern District of California

Mr. Cash's limitations in his hypothetical. "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993)); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Here, the ALJ failed to include limitations set forth by Dr. Haroun including the following: moderate limitations in maintaining attention and concentration for extended periods of time; ability to get along with co-workers and peers without distracting them; ability to work in coordination with or proximity to others without being distracted by them; and responding appropriately to changes in a work setting. (AR 62-63.) Moreover, had the ALJ accorded proper deference to Mr. Cash's other treating physicians, Dr. Shefayee and examining physician Dr. Khalsa, he would have had to include in the hypothetical the limitations in maintaining concentration, persistence, and pace. (AR 415, 599.) The ALJ erred by relying on an incomplete hypothetical not reflective of the full range of Mr. Cash's limitations.

### F. The ALJ Did Not Err by Assessing Plaintiff's Credibility

In evaluating a claimant's credibility, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (citing *Smolen*, 80 F.3d at 1281.) The court defers to the ALJ's credibility determination if it is supported by substantial evidence in the record.

The ALJ gave specific, clear and convincing reasons for discounting Mr. Cash's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The ALJ found that Mr. Cash's medically determinable impairments could be expected to cause his alleged symptoms, but the ALJ found Mr. Cash's statements about the intensity, persistence, and limiting effects of those symptoms "far from credible." (AR 21.) In so doing, the ALJ focused on Mr. Cash's lack of candor in his reports about his drug use to Dr. Khalsa, Dr. Shefayee, and Ms. Dawkins. (*Id.*) The ALJ also found that Mr. Cash's testimony at the hearing regarding his physical functionality was different from what he had reported to Dr. Lewis. (*Id.*) The ALJ found inconsistencies between (1) Mr. Cash's testimony at the hearing regarding his feelings of self-worth and enjoyment of social relationships

1    and (2) information contained in Dr. Shefayee's report. The ALJ concluded that Mr. Cash had

2    exaggerated his symptoms. (*Id.*) Finally, the ALJ found that the fact that Mr. Cash had never

3    worked called into question whether Mr. Cash's lack of employment was related "more to

4    motivation" than to his injuries. (*Id.*)

5        The ALJ also referenced the evidence in the record that Mr. Cash was not motivated to seek

6    treatment and that he was only interested in seeking SSI benefits. (AR 18.) The ALJ was permitted

7    to consider both Mr. Cash's lack of candor regarding his drug use and also his failure to seek

8    treatment in assessing his credibility. *Tommasetti,* 533 F.3d at 1039 (credibility determinations

9    may be based upon a "failure to seek treatment or to follow a prescribed course of treatment"); *see*

10   *also Thomas,* 278 F.3d at 959 (ALJ may consider applicant's  "extremely poor work history" and

11   "little propensity to work" as well as "conflicting information about her drug and alcohol usage").

12   The ALJ did not err by finding Mr. Cash's testimony not credible.

13       **G. Award and Remand**

14       Mr. Cash asks for an award of benefits or, alternatively, for a remand. It is within the court's

15   discretion to either to remand a case for further administrative proceedings or for an award of

16   benefits. *See McAllister v. Sullivan,* 888 F.2d 599, 603 (9th Cir. 1989). Remand is warranted if

17   additional administrative proceedings could remedy defects in the decision. *See, e.g., Kail v.*

18   *Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984). On the other hand, a court may forgo a remand

19   where "further proceedings [are] unnecessary if the record is fully developed and it is clear from

20   the record that the ALJ would be required to award benefits." *Holohan v. Massanari*, 246 F.3d

21   1195, 1210 (9th Cir. 2001). Because the ALJ did not give sufficient weight to the reports of the

22   treating physicians, and because the ALJ's hypothetical to the vocational expert did not reflect all

23   of the claimant's limitations, the court remands for further consideration.

24

25

26

27

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, Mr. Cash's motion is granted in part and denied in part, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 10, 2015

_____
LAUREL BEELER
United States Magistrate Judge